604 So.2d 225 (1992)
Detroit WHITWORTH, Leroy Whitworth, H.J. Whitworth, Frances Whitworth, Edna Watts and Annie Bell Lovett
v.
Melveree KINES.
No. 90-CA-0579.
Supreme Court of Mississippi.
May 27, 1992.
Rehearing Denied August 12, 1992.
*226 William D. Boerner, Boerner & Breeland, Brookhaven, for appellants.
Robert G. Turnage, Monticello, for appellee.
En Banc.
ROY NOBLE LEE, Chief Justice, for the Court:
Melveree Kines filed a petition to confirm a warranty deed and for damages in the Chancery Court of Lawrence County, Mississippi, seeking to ratify and confirm the execution and delivery of a warranty deed from an Inez W. Wells to and in favor of Melveree Kines, dated August 16, 1988. Respondents were Detroit Whitworth and his siblings, the natural heirs at law of the grantor, Inez W. Wells. They also filed a cross-petition for cancellation of the deed and confirmation of the Wells' title in themselves.
After a full hearing, the lower court entered judgment in favor of the petitioners, upholding the warranty deed and confirming title in her, but denied damages. The respondents and cross-petitioners have appealed to this Court and present two issues for decision:
I. The Chancellor erred in finding that Wells had sufficient capacity to sign a deed, and further erred in finding that the deed was delivered to Kines.
II. The Chancellor erred in failing to find a confidential relationship existed between Wells and Kines, a presumption of undue influence should have been acknowledged by the lower court, and that presumption was not rebutted by clear and convincing evidence.

FACTS
The facts favorable to the appellee follow.
Mrs. Wells lived in Lawrence County where she owned a home and the land involved in this suit. She also owned land in adjacent Wathall County. Appellee, Kines, is a niece by the half-blood to Mrs. Wells. In the early part of July 1988, Mrs. Wells was suffering from terminal cancer and appellee, who resided in New York State, came to Lawrence County in July of that year to take care of Mrs. Wells. She had been hospitalized three times during the year 1988, the first time being in the spring for chemotherapy treatments, the second time in July at the Monticello Hospital, *227 and the third time from August 18 through August 29, 1988, when she succumbed to the cancer. Kines had been coming down to Lawrence County from New York off and on for about three years to look after and care for Mrs. Wells. The last time she was caring for and living with Mrs. Wells was approximately eight weeks before she died. Mrs. Kines looked after Mrs. Wells, cooked for her, fed her, bathed and dressed her.
On August 10, 1988, appellee paid off a mortgage on the house of Mrs. Wells, which mortgage had been executed by Mrs. Wells and her husband during his lifetime. On August 10, 1988, appellee paid the down payment of $800.00 for a roofing job on the house and paid the balance of $410.00 on that job prior to August 16, 1988. These funds were expended by appellee from her own funds and were part of the consideration for the execution of the warranty deed on August 16, 1988. Prior to that time, Mrs. Wells had been able to help see about her own needs and had not gotten "totally down". She would walk some and was on medication, although she was weak. The Home Health Services Nurse had visited the house to assist in her care on several occasions and was at her house before she entered the hospital for the last time before Mrs. Wells died.
On August 16, 1988, Alivus Evans contacted Ralph Hearn, then Justice Court Judge in Lawrence County, to go to the home of Mrs. Wells and take an acknowledgment. Hearn and Evans went to her house and appellee and Reverend Oscar Mikell were present. Mrs. Wells asked him to acknowledge the deed, she signed it and Judge Hearn signed it on the first page for acknowledgement instead of the second page. Hearn testified that he had made a mistake on his part. Mrs. Wells walked over and sat down in a chair when he and Evans arrived. Mrs. Wells appeared conscious of what was going on and was coherent in her speech. All the witnesses present testified that Mr. Hearn gave the deed back to Mrs. Wells and that she in turn, gave it to Kines after it had been signed, except Judge Hearn testified that Mrs. Wells kept the deed in her possession.
According to Alivus Evans, an eighty-nine year old resident of Lawrence County, he had known Mrs. Wells since 1925 and she was an honest and nice person but she had also been strong willed. On August 16, he had gone to tell Judge Hearn that Mrs. Wells wanted him to come to her house and put the "stamp" on the deed because she "sold the land". Judge Hearn went with Evans who testified he saw Mrs. Wells sign the deed that day and then Judge Hearn signed it; that after signing it Mrs. Wells gave the deed to Kines, and that Mrs. Wells had acted "normal" on August 16 and that Kines provided her with her daily care.
Reverend Oscar Mikell was a nearby neighbor of Mrs. Wells and a pastor of the Coleman Chapel Church of God and Christ. According to him, he had been the person to drive her around to take care of her business for quite sometime. On August 16, he had taken Mrs. Wells and Kines home and Mrs. Wells had sent Hearn to get him to notarize a deed. Reverend Mikell testified that he saw Mrs. Wells sign the deed that day, but he did not read it and did not know what it contained. After she signed it, Judge Hearn signed the deed then he saw Mrs. Wells hand the deed to appellee.
On March 11, 1987, Mrs. Wells executed her last will and testament in which she left her property to her natural heirs at law. During the period of sickness, she decided to revoke that will. It had appointed Detroit Whitworth, one of the appellants, as executor and had left, as stated, the property to her whole-blooded brothers and sisters. A written revocation was executed on July 25, 1988, before she executed the warranty deed was in favor of appellee. Reverend Mikell, Alivus Evans, appellee and Mrs. Wells went to the bank and the revocation was signed there. Mrs. Wells took the will out of her lock box and destroyed it.
According to Detroit Whitworth, other brothers and sisters of Mrs. Wells were not available and he contacted appellee in New York and requested that she come to Mississippi and help care for Mrs. Wells. Detroit *228 had been handling the business affairs of Mrs. Wells and continued to do so until her death. She had business interests, such as a farm, farm equipment, and other assets. Detroit Whitworth and Mrs. Wells had keys to her safety box. There were articles such as money, a will, and other papers in that box. The testimony reflects that approximately $3,000.00 in cash was in the box prior to Mrs. Wells death. Mrs. Wells apparently became disappointed in Detroit's handling of her business. She claimed that he had sold her cattle and had not paid the money to her and had sold her tractor without paying her the sale price. At the time of Mrs. Wells' death, her safety deposit box contained nothing of value or of interest. Detroit Whitworth testified that, while Inez Wells was in the hospital, she requested him to sell her cattle, the tractor and a pick-up truck, which he sold with the exception of the truck, and placed the money in First Bank  Monticello in the name of Detroit Whitworth and wife. Detroit also testified that he did not get any cash out of the safe deposit box.
Mrs. Wells had approximately twenty (20) acres of land in Walthall County, which was sold through Don Rushing Realty for a consideration of $27,000.00 and the transaction was closed August 19, 1988. The appellee was not connected with that transaction.
Proof of the appellants constituted an issue of fact as to the competency of Mrs. Wells to execute the deed of conveyance. Prior to that execution, she was taken to the courthouse where two deputy clerks were called to come to her automobile, see her sign the deed and take her acknowledgment. They declined because they thought she was unable or incapable of doing so. Two days later, Mrs. Wells executed the instrument on August 16, 1988. Detroit Whitworth testified that he sold the cattle and tractor and deposited the proceeds in an account for him and his wife, but all with the consent of Mrs. Wells.
LAW
I.
The Chancellor erred in finding that Wells had sufficient capacity to sign a deed, and further erred in finding that the deed was delivered to Kines.
It is an elementary principle of law, well established through the years, that this Court will not reverse a chancery court's factual findings unless the chancellor is manifestly in error or his findings are not supported by substantial evidence. Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987); Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Gilchrist Machinery Co., Inc. v. Ross, 493 So.2d 1288, 1292 (Miss. 1986). The Court said in Mullins:
Put another way, this Court ought and generally will affirm a trial court sitting without a jury on a question of fact unless, based on substantial evidence, the court be manifestly wrong. UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc., [525 So.2d 746, 753-54 (Miss. 1987)]; Brown v. Williams, et al., 504 So.2d 1188, 1192 (Miss. 1987); Harkins v. Fletcher, 499 So.2d 773, 775 (Miss. 1986); Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986); Will of Polk, 497 So.2d 815, 818 (Miss. 1986).
Mullins, 515 So.2d at 1189.
The same capacity is required to execute a valid deed as is required for making a will. In Young v. Martin, 239 Miss. 861, 125 So.2d 734, 738 (1961), the Court said:
The same rule for testing mental capacity applies alike to wills and deeds. Temporary or intermittent insanity or mental incapacity does not raise a presumption that such disability continued to the date of execution. It is sufficient if the testator understands and appreciates the nature of his act, the natural objects or persons of his bounty and their relation to him, and is capable of determining how he desires to devise and bequeath his property. Lambert v. Powell, 199 Miss. 397, 24 So.2d 773, 168 A.L.R. 964, and authorities there cited. See also Cowart v. Cowart, 211 Miss. 459, 51 So.2d 775; Hunt v. Lewis, 219 Miss. 812, 70 So.2d 13; Pipes v. Webb, 236 Miss. 612, 111 So.2d 641.
*229 Id. 125 So.2d at 738. In Smith v. Smith, 574 So.2d 644 (Miss. 1990), the Court said:
[T]he burden of proving lack of mental capacity rests squarely on the party seeking to have such deed set aside. Clear and convincing evidence is necessary to establish this lack of mental capacity. Unless the proof put on by the party seeking to set aside a deed establishes that the grantor was permanently insane up to and beyond the time of the execution of the deed, the test of the grantor's mental capacity is to be applied as of the time of the execution of the deed.
Id., at 652 (quoting Richardson v. Langley 426 So.2d 780, 783 (Miss. 1983).
This Court recognizes that mental incapacity or insanity, "is not always permanent, and a person may have lucid moments or intervals when that person possesses necessary capacity to convey property." Smith, 574 So.2d at 653. See also Williams v. Wilson, 335 So.2d 110, 112 (Miss. 1976).
Mrs. Wells suffered from lung cancer which resulted in her death. On March 11, 1987, she executed a last will and testament leaving all her property to four of her siblings. The record indicates that one of them, e.g. Detroit Whitworth sold her cattle and tractor, placing the proceeds from the sales in his own account and that Mrs. Wells had received little assistance from those family members. On July 25, 1988, she revoked the will before witnesses and on August 16, 1988, she executed the warranty deed of conveyance to appellee, reserving unto herself a life estate in the property. All witnesses to the execution of the deed stated that she was mentally competent and knew what she was doing, realizing the consequences of her act. The chancellor found
that Inez W. Wells delivered said Deed to Plaintiff, Melveree Kines, which deed contained a defective acknowledgment, but that the evidence offered in support of said deed and the acknowledgement is sufficient and adequate evidence that Inez W. Wells signed and delivered the said Warranty Deed, at a time when she had good and valid mental capacity and also was fully mentally capable of knowing and realizing the affects of her actions and of signing, executing and delivering said Deed. Further, that Melveree Kines, Plaintiff, did pay good and valid and sufficient considerations for said deed and lands.
THE COURT FURTHER FINDS that the care by Plaintiff, Melveree Kines, extended to the deceased and grantor, Inez W. Wells, was good and valuable consideration for the deceased, and that the deceased realized that this was a portion of valuable considerations she received and further, that said Deed has been proven and established, and is established, as a valid deed.
* * * * * *
The Defendants and Cross-Plaintiffs have wholly failed to prove and establish that the said Warranty Deed is void in any way, while Plaintiff has proven and established that the said Warranty Deed is good and valid and passes complete title in said property.
(emphasis added).
Mrs. Wells also sold property in Walthall County, Mississippi, for approximately $27,000.00 which transaction was closed on August 19, 1988. Appellee had no involvement in that transaction. Evans testified that Mrs. Wells handed the deed in question to appellee after it was notarized and Reverend Mikell also testified that he saw Mrs. Wells hand the deed to appellee that day. Certainly, the chancellor could not be said to be manifestly wrong in finding that there was a valid delivery. Reeves v. Reeves, 374 So.2d 791 (Miss. 1979); McMillan v. Gibson, 222 Miss. 408, 76 So.2d 239 (Miss. 1954). Likewise, we are of the opinion that he was not manifestly wrong in holding that Mrs. Wells had the mental capacity to execute the deed.
The issue number one is rejected.
II.
The chancellor erred in failing to find a confidential relationship existed between Wells and Kines, a presumption of undue *230 influence should have been acknowledged by the lower court, and that presumption was not rebutted by clear and convincing evidence.
The chancellor made the following finding of fact on the issue of confidential relationship:
THE COURT FURTHER FINDS that the deceased had the mental capacity of knowing and understanding the consequences of her acts, and that there has been no evidence presented of any actual undue influence of deceased on the part of Plaintiff, nor anyone on her behalf.
THE COURT FURTHER FINDS that there was no fiduciary relationship between Melveree Kines and the deceased, Inez W. Wells, and that Melveree Kines, Plaintiff, did not take part in any business affairs of the deceased; that the Cross-Bill should be dismissed, and that the deed and its validity should be recorded in the County records as a good and sufficient Deed.
(emphasis added).
The confidential relationship "arises when a dominant, overmastering influence controls over a dependent person or trust justifiably reposed." Mullins, 515 So.2d at 1192-93. See also Hendricks, 421 So.2d at 1041; Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959). In order to establish the existence of a confidential or fiduciary relationship, the burden of proof lies on the party asserting it. Mullins, 515 So.2d at 1192; Norris v. Norris, 498 So.2d 809, 813 (Miss. 1986); Harris v. Sellers, 446 So.2d 1012, 1014 (Miss. 1984); Jeter v. Culp, 343 So.2d 1226 (Miss. 1977). When a confidential relationship has been established, a presumption of undue influence arises. The burden then shifts to the grantee to show by clear and convincing evidence that there was no undue influence. Kelly v. Shoemake, 460 So.2d 811, 819-20 (Miss. 1984); Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984).
In the present case, the chancellor found that there was no confidential relationship. The appellee came from New York to Lawrence County when called to do so by Mrs. Wells and members of her family and her services were the physical attending to and caring for Mrs. Wells. She handled none of Mrs. Wells' business affairs. The sums that appellee spent to pay off the mortgage and to roof the house were her own funds. The confidential relationship with Mrs. Wells was that between her and her brother, Detroit Whitworth. There were only two (2) keys to Mrs. Wells lock box, one held by her and the second by Detroit Whitworth. He looked after and managed her business such as cattle, farm equipment and personal property. The record reflects that Detroit sold the tractor and other farm equipment and deposited the proceeds in his own bank account rather than that of Mrs. Wells.
We are of the opinion that the chancellor was not manifestly in error in holding that no confidential or fiduciary relationship existed between Mrs. Wells and appellee, which would affect the execution of the warranty deed.
The issue number two is rejected.
There being no reversible error in the judgment of the lower court, that judgment is affirmed.
AFFIRMED.
ROBERTSON, SULLIVAN and McRAE, JJ., concur.
PRATHER, J., dissents, joined by HAWKINS and DAN M. LEE, P.JJ., and PITTMAN, J.
HAWKINS, P.J., dissents, joined by DAN M. LEE, P.J., and PRATHER, J.
BANKS, J., not participating.
HAWKINS, Presiding Justice, dissenting:
I join Justice Prather in her dissent, and write to emphasize her second conclusion that the chancellor also erred in not setting aside the deed on the ground of undue influence arising from a confidential relationship.
One of the greatest decisions ever handed down by this Court is Ham v. Ham, 146 Miss. 161, 110 So. 583 (Miss. 1926), involving *231 a deed from a brother to another brother, also his business partner. This case told (1) how a confidential relationship in fact could be created between two people, and (2) its legal effect on a conveyance or devise arising from such relationship. Its words deserve committing to memory:
The rules governing gifts, conveyances, etc., between parties to such a fiduciary relation are the same as those governing gifts, conveyances, etc., between parties occupying the conventional fiduciary relations, such as physician and patient, attorney and client, guardian and ward, trustee and cestui que trust, etc.
146 Miss. at 173, 110 So. at 584.
Then, quoting no less authority than Pomeroy, the opinion continues:
"It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and duties involved in it need not be legal, it may be moral, social, domestic, or merely personal." 2 Pomeroy Equity Jurisprudence (4th Ed.) section 956.
When such a relation exists, and the parties thereto  "consciously and intentionally deal and negotiate with each other, each knowingly taking a part in a transaction, and there results from their dealing some conveyance or contract or gift ... the principle literally and directly applies. The transaction is not necessarily voidable, it may be valid, but a presumption of its invalidity arises which can only be overcome, if at all, by clear evidence of good faith, of full knowledge, and of independent consent and action." 2 Pomeroy Equity Jurisprudence (4th Ed.), section 957.
The burden of overcoming this presumption is on the party claiming under the conveyance, contract, or gift. Meek v. Perry, 36 Miss. 190; Hitt v. Terry, 92 Miss. 671, 46 So. 829.
The usual method of proving independent consent and action in such cases, and probably the only way it can be clearly proven, is by showing that in making the deed the grantor acted on the advice of a competent person, disconnected from the grantee and devoted wholly to the grantor's interest. 2 Pomeroy Equity Jurisprudence (4th Ed.), sections 958 and 960. (Emphasis added)
146 Miss. at 173-174, 110 So. at 584-85.
Words from Ham have been quoted many times in subsequent decisions of this Court.[1] Faithful application of the simple principles of Ham afford chancellors of this State the greatest, if indeed not the only weapon devised by a court against greed and dishonesty imposed upon the weak and elderly by the persons they depend upon and the very ones they should be able to trust. Open honesty, honor and scrupulous fairness with others are praiseworthy attributes in any transaction or relationship, but nowhere is their need so *232 critical as in a confidential or fiduciary relationship.
It is unfortunate that there are a few members of the legal profession who cannot understand the wisdom of Ham, and some who do not wish to understand it.
We can all mourn the melancholy truth that avarice and deceit have always been a part of the human character and promise to remain so for a long time to come. Courts cannot change this.
Courts can, however, at times protect the innocent from abuse and victimization, and it is profoundly lamentable upon those occasions when the facts of a case call for the application of the principles of Ham a Court fails to unsheath this mighty sword and swing it.
DAN M. LEE, P.J., and PRATHER, J., join this opinion.
PRATHER, Justice, dissenting:
Respectfully, I dissent from the majority view in this Lawrence County Chancery Court suit to confirm title to a purported deed from the decedent, Inez Whitworth Wells, to her niece, Melveree Kines. It is my view that under the case law of this state and the facts of this case, there was a confidential relationship that developed between Inez Wells and Melveree Kines in the last months of Wells' life and an overreaching influence exerted by Kines on Wells to secure the purported deed in question at a time when Wells lacked the mental capacity to make a valid conveyance. For this reason, the chancellor, in my view, committed manifest error in his ruling.

I.
This case is resolved on the facts. I do not disagree with the facts stated in the majority opinion, but respectfully, I suggest that other facts not included in the opinion mandate a different result. Therefore, this dissent requires a development of the pertinent facts in a chronological sequence leading to my conclusion above.
Seventy-one-year-old Inez Whitworth Wells was a widow without children. She owned twenty-seven acres of land in Walthall County and forty-seven acres of land in Lawrence County upon which she had a home, cattle, and farm equipment. Her heirs-at-law were her five brothers and sisters of the whole blood. One brother, Leroy, lived in California and another brother, Detroit, lived in Gulfport, Mississippi. Melveree Kines, the complainant in this lawsuit, was a daughter of Cora, Wells' half-sister, and she lived in Brooklyn, New York. Kines visited Wells over the last several years during Wells' deteriorating health and last illness with some frequency.

II.
In 1974, Inez Wells and her husband acquired title to the forty-seven acre tract, in issue here, located in Lawrence County. Her husband subsequently died, giving title of that land to Wells. She lived alone on the property. In 1987, Wells executed a will leaving the realty above to her siblings of the whole blood and named her brother, Detroit Whitworth, as her executor. Detroit, sixty-seven years old, aided Wells in the sale of her cattle and a tractor, and secured $3,700 for the sales. The proceeds were deposited in a bank account in Detroit's and his wife's name to avoid conflict for Wells with her social security benefits. On March 20, 1987, Wells opened a safety deposit box jointly with Detroit into which she placed her 1987 will, her deeds to the realty, the FHA mortgage papers on the realty, and $3,000. Both Wells and Detroit had keys to the box; entry into this box had been by Wells only until August 19, when Detroit checked it.
In March, 1988, Wells was diagnosed with lung and breast cancer, and her brother Leroy entered her in a Jackson hospital for chemotherapy treatment. Leroy stayed with her from March until "after Easter Sunday" and returned to California. Wells was again hospitalized June 26 to July 1 and again July 5 through July 15, 1988. Detroit testified that while he stayed with Wells from July 1 to July 15, he had to do everything for Wells. The doctors advised him not to leave Wells alone. However, because Detroit was needed by his sick *233 wife and another sister, he had to leave Wells.
Melveree Kines was asked by Leroy to come from New York to stay with Wells. Kines came on July 15, 1988, and lived with Wells and provided her basic care until her death.
A home health nurse also came and helped tend her needs. Detroit visited his sister Wells as often as he could and he noted her apparent deterioration. Wells could carry on little conversation and physically was unable to control her body functions. It was Detroit's testimony that Wells was not capable of business decisions during this period of his visits after July 15, 1988. Acting on his opinion that Wells lacked mental ability, Detroit sought the appointment of a conservator for Wells in late August. More on that fact later.
After July 15, 1988, Melveree Kines lived with Wells in her home and attended her needs. On July 25, 1988, Wells signed a statement prepared by attorney Joe Dale Walker in which she revoked her 1987 will. This statement was witnessed by Reverend Oscar Mikell, a neighbor to Wells, and by Alius Evans, eighty-nine years of age and a long-time friend and relative by marriage. The revocation was signed by Evans and Mikell at the bank and then placed in Wells' safe-deposit box on July 26, 1988.
The testimony of Melveree Kines revealed that she put a roof costing $1,208 on Wells' house on August 12 and, on August 10, paid off Wells' mortgage of $2,698.46 to Farmers Home Administration. The mortgage was paid off with cash brought to Melveree Kines by her husband who flew from New York to bring it. This money paid for the roof and mortgage was the consideration paid by Kines for her purported purchase of Wells' house and land.
On August 14 or 15, Kines drove Wells to the county courthouse to sign a warranty deed to the realty in question. Accompanying her was Reverend Mikell and Alius Evans; Kines never got out of the car and denied taking any initiative toward preparation of the deed or its execution. Alius Evans asked a deputy chancery clerk, Alice Bryant, to come to the car and take Wells' acknowledgment on the deed. Bryant came to the car, but refused to take the acknowledgment.
Bryant testified that "some men came in and they wanted me to acknowledge this lady's signature." (TR 133). "The lady looked like she was real sick." (TR 134). "All I know is her name was Wells." "They just said that  they called her and told her to sign there. And I kept  I have said, `Wait.' I said, `Don't use her hand.' You know, it didn't seemed [sic] like she knew what she was doing." (TR 135). "Q. Was the lady conscious? A. She didn't seem like she was  she was awake, but she seemed like, you know, in between there, awake and asleep. Like she was drunk." "[S]he looked drugged." (TR 135)
Bryant refused to take Wells' acknowledgment because Wells was not alert and could not converse with her or hold a pen in her hand. Another deputy chancery clerk, Peggy Ballard, had the same experience in August, 1988, when a man asked her to come to a car to acknowledge a signature on a deed. Ballard recognized the names of "Inez Wells" and "Melveree Kines" on the deed. The man introduced her to Wells, who was seated on the back seat of the car. "I asked the lady if she could sign the document for me. And she didn't say anything. And I looked at her, and she didn't have her eyes open. And I just asked her if she could open her eyes and sign this for me. And she never did say anything. I just told this man that I could not. I said because she couldn't even write." (TR 144).
Another witness, Myrtle Bridges, a niece of Wells, visited Wells four times from March to August 14 and noted a steady decline of strength and alertness in the condition of Wells. Specifically, on August 14, Bridges could not get a response except for Wells speaking an incorrect name. Wells was helped to go to the bathroom because of her physical weakness. Wells then returned to bed.
On August 16, 1988, Justice Court Judge *234 Ralph Hearn[1] rode with Alius Evans to Wells' home where Wells, Alius Evans, Reverend Oscar Mikell and Kines were present. Judge Hearn testified that Wells asked him to take her acknowledgment on the deed in question and he saw her sign the deed. The justice court judge signed the deed on the first page of the deed instead of on the acknowledgment form on the second page. This failure to properly execute the acknowledgement gave rise to this suit to confirm title. He testified that Wells was "up and walking" on her feet and conscious of what she was doing. According to Hearn, Wells kept the deed after the acknowledgment was taken  no delivery was observed by him.
Alius Evans gave the same testimony as Justice Hearn, but stated that the deed was given to Kines by Wells right after Justice Hearn's acknowledgment. Evans testified first that Kines asked attorney Robert Turnage to prepare the deed, but he later stated that Wells made that request. Evans went with Kines to the FHA office to pay off Wells' loan with a check drawn on money she put in the bank. Alius Evans was referred to as a relative by marriage to the Whitworths and Detroit Whitworth called him "Uncle."
Kines repeatedly denied knowing the value of Wells' house for which she had paid less than $4,000. However, on August 16, 1988, she insured the house for $30,000.
Pat Mullins, a home health registered nurse, visited Wells during July and August, 1988. She testified to Wells' weakened condition in the last stages of cancer and to Wells' consciousness until "the last week or so[;] she had deteriorated pretty rapidly." Mullins called Dr. Waller who made arrangements to admit Wells to the hospital for her last illness on August 15, 1988. Nurse Mullins testified that Wells was dependent on Melveree Kines for her daily needs, and was unable to get out of bed, go to the bathroom, clean herself, or ambulate.
Although the record is sketchy, on August 19, 1988, there was an attempt to sell Wells' twenty-seven acres of land in Walthall County. Reverend Mikell had apparently taken Wells to Tylertown to arrange a sale. The check for the sale of Wells' land was made payable to Alius Evans. Since this realty is not in issue in this lawsuit, there are few facts developed. Why the check was made payable to Alius Evans instead of Wells is not explained. But the realtor determined before sale that the check had to be re-drafted. Therefore, the deed was not delivered. The realty company held the $20,000 sales price in escrow. Ultimately, this money was paid to Wells' estate after her death.
Also, on August 19, 1988, Detroit went to the safety deposit box he jointly held with Wells, using his key. The former contents of the box, i.e., the deed and mortgage papers to the realty in issue, $3,000.00, and the 1987 will had been removed. The only item in the box was Wells' revocation of her former 1987 will. On August 31, Detroit secured medical certificates of two doctors for the purpose of filing a petition for appointment of a conservator for Wells. Before this procedure could be completed, Wells died on September 1, 1988. These conservatorship papers were missing from the chancery clerk's office at the time of this trial, but docket entries supported the fact that Detroit attempted to have a conservator appointed because of Wells' diminished physical and mental condition. Detroit was appointed administrator of Wells' estate on September 21, 1988. Detroit paid the funeral, burial, and expenses of Wells' last illness from the bank account of $3,700 which held Wells' money from sale of her farm equipment.

III.
On these facts, respectfully, it is my opinion that the chancellor was manifestly in error to find that Wells had sufficient capacity to sign the deed of her home to Melveree Kines on August 16, 1988.
By her own testimony Kines acknowledged that Wells needed assistance to eat, *235 bathe, and walk until she had gotten "totally down" until a little before she went to Lawrence County Hospital the last time. (TR. 30). In July the doctors told Detroit that Wells could not be left alone; the nurse testified of her steady deterioration during July and August. The nurse testified that on August 18 Wells was not alert and reported Wells' illness to the doctor for the last hospitalization; the deed was purportedly signed by Wells only two days before. Two deputy clerks refused to acknowledge Wells' signature because of her mental condition on August 14 or 15.
The only persons who did testify about Wells' capacity to sign the deed, excepting Reverend Mikell, were Kines, Alius Evans, and Justice Judge Hearn. The justice judge's ineptness in attempting to acknowledge Wells' signature caused the filing of this lawsuit to confirm the deed against the heirs-at-law of Wells. Kines and Alius were the two recipients of Wells' property, Kines of the forty-seven acres in Lawrence County and Alius of the proceeds of the sale of twenty-seven acres in Walthall.
In sum, these facts support the conclusion that Wells lacked capacity to sign the deed and that Kines was in a confidential relationship with Wells from July 15, 1988, until her death. Further the presumption that arises from that relationship was not overcome by Kines by clear and convincing evidence.

IV.
The case law of this state has been succinctly stated in the recent case of Smith v. Smith, 574 So.2d 644 (Miss. 1990), regarding capacity to execute a deed. Regarding capacity, this Court stated:
The majority of the testimony in the trial below was concerned with Henderson Smith's mental capacity to execute the deed in question. The degree of mental capacity required in a case such as this "is that the grantor shall have had sufficient mental capacity to understand in a reasonable manner the nature of the transaction in which he was engaged and its consequences and effect upon his rights and interests." Moore v. Stone, 208 So.2d 585, 586 (Miss. 1968). This Court has further stated:
Well established in this jurisdiction is the long-standing rule that the burden of proving lack of mental capacity rests squarely on the party seeking to have such deed set aside. Clear and convincing evidence is necessary to establish this lack of mental capacity. Unless the proof put on by the party seeking to set aside a deed establishes that the grantor was permanently insane up to and beyond the time of the execution of the deed, the test of the grantor's mental capacity is to be applied as of the time of the execution of the deed.

Richardson v. Langley, 426 So.2d 780, 783 (Miss. 1983) (citations omitted). This Court has recognized that mental incapacity or insanity is not always permanent, and a person may have lucid moments or intervals when that person possesses necessary capacity to convey property. As was stated in Williams v. Wilson, 335 So.2d 110, 112 (Miss. 1976), quoting Ricketts v. Jolliff, 62 Miss. 440 (1884),
a lucid interval is not merely a cessation of the violent symptoms of the disorder, but a restoration of the faculties of the mind sufficiently to enable the party soundly to judge of the act. The evidence in support of a lucid interval, after derangement has been established, should be as strong and demonstrative of such fact as when the object of the proof is to show insanity, and it ought to go to the state and habit of the person, and not to the accidental interview of an individual or to the degree of self-possession in any particular act.
... .
This Court has provided relief in certain cases involving lack of capacity, where the condition does not rise to permanent insanity or total lack of capacity. As was stated in Richardson v. Langley, 426 So.2d 780, 783 (Miss. 1983):
We have traditionally made a distinction between "weakness of intellect" *236 and a total lack of capacity to execute a deed. Such a "weakness of intellect" when coupled with another factor, such as grossly inadequate consideration, or the existence of a confidential relationship may be sufficient to warrant the granting of equitable relief. Absent such a confidential relation, or grossly inadequate consideration, a "weakness of intellect" in and of itself, which does not rise to the standard of a total lack of capacity to execute a deed is an insufficient basis upon which to set aside a deed. This rule allowing an equity court to set aside a deed upon a finding of a weakness of intellect, plus another factor such as grossly inadequate consideration was even more clearly defined in Cunningham v. Lockett, 216 Miss. 879, 63 So.2d 401 (1953). Cunningham held that a weakness of intellect when coupled with grossly inadequate consideration did indeed constitute grounds for setting aside a deed. Nonetheless, we held that "weakness of intellect" required evidence of more than age and sickness on the part of the grantor. Such weakness must be a weakness of the mental faculties.
(citations omitted); see also Mullins v. Ratcliff, 515 So.2d 1183, 1190 (Miss. 1987) (citing Richardson).
Applying the Richardson standard to the facts present here, I submit Wells lacked capacity to execute the deed in question based upon the testimony of Detroit and Leroy, her brothers, Alice Bryant and Peggy Ballard, deputy chancery clerks, and Myrtle Bridges, a niece of Wells, none of whom inherit from Wells. There were witnesses who testified that Wells was in a lucid moment when she signed the deed  Justice Judge Hearn, Alius Evans, Reverend Mikell and Kines. Even conceding that Wells might have had a lucid moment, as these witnesses testified, this Court in Smith, supra, and in Richardson v. Langley, 426 So.2d 780, 783 (Miss. 1983) held that "weakness of intellect" when coupled with another factor such as grossly inadequate consideration (which is present here) or a confidential relationship (which I suggest is present under these facts) is sufficient to set aside a deed.
Certainly in this factual situation, Wells was steadily deteriorating mentally and physically from July 15 to her death. She was totally dependent on Kines and that dependence created a confidential relationship and the presumption of undue influence arises. I submit that Kines's burden of going forward with proof to overcome the presumption of undue influence by clear and convincing evidence was not met. Estate of McRae, 522 So.2d 731 (Miss. 1988); Mullins v. Ratcliff, 515 So.2d 1183 (Miss. 1987); Murray v. Laird, 446 So.2d 575 (Miss. 1984).
I submit this factfinding is in error. I would set the purported deed aside based on the law and facts. Therefore, I dissent.
HAWKINS and DAN M. LEE, P.JJ., and PITTMAN, J., join this dissent.
NOTES
[1] Vega v. Estate of Mullen, 583 So.2d 1259, 1273 (Miss. 1991) (Hawkins, P.J., dissenting); Marsalis v. Lehmann, 566 So.2d 217, 221 (Miss. 1990) (Hawkins, P.J., dissenting) ("This bright line rule has served this state well for almost two centuries."); Matter of Estate of Vick, 557 So.2d 760 (Miss. 1989); Estate of McRae, 522 So.2d 731 (Miss. 1988); Mullins v. Ratcliff, 515 So.2d 1183 (Miss. 1987); Matter of Launius, 507 So.2d 27 (Miss. 1987); Will of Polk, 497 So.2d 815 (Miss. 1986); In re Will and Estate of Varvaris, 477 So.2d 273 (Miss. 1985); Murray v. Laird, 446 So.2d 575 (Miss. 1984); Hendricks v. James, 421 So.2d 1031 (Miss. 1982); Mansell v. Gross, 345 So.2d 1315 (Miss. 1977); In re Estate of Bilello, 317 So.2d 916 (Miss. 1975); Jones v. Jones, 246 So.2d 486 (Miss. 1971); Jones v. Singley, 242 So.2d 430 (Miss. 1970); In re Woodard's Will, 199 So.2d 243 (1967); Thomas v. Jolly, 251 Miss. 448, 170 So.2d 16 (1964); Glenn v. Macon, 249 Miss. 493, 163 So.2d 239 (1964); Wofford v. Wofford, 244 Miss. 442, 142 So.2d 188 (1962); Russell v. Douglas, 243 Miss. 497, 138 So.2d 730 (1962); Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959); McElveen v. McElveen, 233 Miss. 672, 103 So.2d 439 (1958); Sunflower Farms, Inc. v. McLean, 233 Miss. 72, 101 So.2d 355 (1958); Saulsberry v. Saulsberry, 223 Miss. 684, 78 So.2d 758 (1955); Hickey v. Anderson, 210 Miss. 455, 49 So.2d 713 (1951); O'Bannon v. Henrich, 191 Miss. 815, 829-38, 4 So.2d 208, 212-13 (1941) (McGehee, J., dissenting); Lindeman's Estate v. Herbert, 188 Miss. 842, 193 So. 790 (1940); Watkins v. Martin, 167 Miss. 343, 147 So. 652 (1933); Bourn v. Bourn, 163 Miss. 71, 140 So. 518 (1932).
[1] Justice Hearn has since been removed from office for "fixing tickets." In re Hearn, 542 So.2d 901 (Miss. 1989), In re Hearn, 515 So.2d 1225 (Miss. 1987).